STATE, Respondent, v. CATHEY, Appellant.

*September 7—October 4, 1966.*

---

[19] *Lock v. State* (1966), 31 Wis. (2d) 110, 142 N. W. (2d) 183.

For the appellant there was a brief by *James M. Shellow, William M. Coffey,* and *Shellow, Shellow & Coffey,* all of Milwaukee, and oral argument by *James M. Shellow* and *William M. Coffey.*

For the respondent the cause was argued by *David J. Cannon,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *Hugh R. O'Connell,* district attorney.

CURRIE, C. J. The appeal raises these three issues:

(1) Was the evidence adduced sufficient to support the finding of guilty?

(2) Was defendant denied the effective assistance of counsel?

(3) Did the state deny defendant due process of law by failing to disclose evidence in its possession which is claimed to have been favorable to defendant?

*Sufficiency of Evidence.*

On the evening of January 2, 1965, at approximately eight or nine o'clock, the complainant Mrs. Minnie Kuter,

then seventy-six years of age, went to the home of a friend, Mr. Verdell Nelson, at 2220 West Galena Street, Milwaukee, Wisconsin.

At about 11 o'clock a poker game began. In the early morning hours of January 3d, Oliver Cathey, the defendant, also went to the Nelson residence and participated in the poker game then in progress. There is conflicting testimony as to whether the game was being played for money.

At approximately 4 a. m. the game broke up and defendant at the request of complainant agreed to give her a ride home. Four persons, the complainant, the defendant, Robert Petry and another person left the Nelson residence in defendant's car. Defendant and Robert Petry both testified that while in the car the complainant stated she had lost some money and would like to earn some more. Defendant testified the complainant stated, "they cleaned [me] out too." The other passenger in the car was not called as a witness by either party.

Defendant dropped Petry and the other passenger off and he and complainant proceeded to the vicinity of North Eleventh street between West Vine and Reservoir streets in the city of Milwaukee. There is no dispute in the testimony but defendant there had sexual intercourse with complainant in the front seat of defendant's car. The conflict in the testimony of complainant and defendant is whether this was involuntary on complainant's part and against her will, or whether she voluntarily consented thereto in return for the promise of payment of money.

Complainant's version of what occurred is this: After stopping his car defendant told complainant, "I am going to. . . . [vulgar term to have sexual intercourse with] you." She pleaded with him and made a reach for the door to try to get out to no avail. He told her not to make any trouble if she wanted to get home. Her legs

were not good so all she could do was plead with him. He yanked her down out of her sitting position and laid her in the front seat, with her head toward the door on the passenger side. She tried to force him off from herself but did not have a "ghost of a chance," as he was so forceful. After he laid her down he pulled up her clothes. She stated that she could not move as she was lying on a slant and the weight of his body held her down. She further stated that she could use her arms, but that they were never very strong, and that when she tried to get out of the car he held her and pushed her back and said, "If you don't want to get hurt you better behave yourself." Defendant persisted in his endeavor and consummated the act of intercourse. He then drove complainant home.

Defendant testified: Complainant had consented to his proposal of intercourse in return for his promise to pay her $25. After completion of the act he gave her only "six or seven dollars." He then drove complainant home. Upon her getting out of the car she stated, "I will fix you for this." He thought she said this because he paid her only six or seven dollars, not the twenty-five agreed upon.

Complainant denied she had consented to the act, and that she had received seven dollars for the same. She further testified that she "was not in need of any money" when she left the Nelson house, as she had approximately six or seven dollars in her possession. She stated that she came to the Nelson residence with $10 and that as she was leaving she remembered she owed Nelson for a "paint brush," paid him for the same and received "five dollars change and a couple of dollars." She further testified that the price of the paint brush was $1.25 and the money she had on her person was the difference between $10 and this cost of the brush.

After getting out of defendant's car, complainant attempted to obtain the license number. She went im-

mediately into the house, "marked down the license number as [she] could remember it" and immediately called the police "as fast as I could get to the phone." The two police officers who promptly responded to her call suggested that she go to the doctor's office for an examination. She agreed and was examined by a police doctor before noon of January 3, 1965. She also turned over to the police the vaginal pad and panties which she had worn that night which did not appear to be soiled, and these were sent the state crime laboratory at Madison for examination. The laboratory's report was not offered in evidence. The police testified they observed no outward marks of violence upon complainant but the coat she had worn appeared to be soiled.

At the time of the alleged rape, complainant weighed 120 pounds, had been using a walking cane for about three years prior to the incident, and had been hospitalized in the fall of 1964 because of an attack of pneumonia. She had had a "heart failure attack" in the summer of 1964, and had been taking a heart pill and a fluid pill every day. At the trial she required the assistance of the bailiff in getting up and out of her chair.

Sec. 944.01, Stats., requires that the act of rape be "by force and against her [the victim's] will." The phrase "by force and against her will" is defined in sec. 944.01 (2) to mean:

". . . either that her utmost resistance is overcome or prevented by physical violence or that her will to resist is overcome by threats of imminent physical violence likely to cause great bodily harm."

Defendant contends that the testimony of complainant in the instant case fails to establish the essential element of "utmost resistance." Whether utmost resistance is overcome is a difficult factual question. Utmost resistance, according to this court,

". . . is a relative rather than a positive term. What would be 'utmost resistance' on the part of a weak and

nervous person, with a temperament easily frightened, might be the veriest sham on the part of a robust person in good health, whose nerves and courage are normal." [1]

What is utmost resistance depends on the particular victim and the particular circumstances of each case.[2] Because of the advanced age and frailty of complainant a factual issue was presented as to whether she did exert the utmost resistance. Upon review of the evidence we conclude there was sufficient evidence to sustain the trial court's finding of guilty.

### Ineffectiveness of Counsel.

Defendant was represented by different counsel than those now prosecuting this appeal. It is defendant's position that his trial counsel was so ineffective as to amount to a denial of effective assistance of counsel. In support of this contention defendant's brief lists four steps it is claimed that trial counsel should have taken and did not which resulted in substantial prejudice to defendant. Before considering these four assignments we deem it advisable to consider the controlling applicable principles of law.

Courts are almost universally in agreement that an assertion of ineffective assistance of counsel will prevail only where the trial representation was so inadequate as to amount to no counsel at all and the trial was reduced to a sham and a mockery of justice. Often after trial charges of incompetency are directed toward counsel because it appears other tactics than those chosen might have been more helpful to the accused. Criminal as well as civil cases cannot be retried at the instance of the loser because he is more hopeful of success on a second

[1] *McLain v. State* (1914), 159 Wis. 204, 149 N. W. 771. See also *State v. Schmear* (1965), 28 Wis. (2d) 126, 130, 135 N. W. (2d) 842.

[2] *Brown v. State* (1906), 127 Wis. 193, 106 N. W. 536.

try.[3] In *Eskra v. State*[4] this court in referring to and quoting from *Pulaski v. State*,[5] stated:

" 'Unless the representation of counsel is so inadequate and of such low competency as to amount to no representation, a new trial cannot be granted on that ground.'
"The federal courts use a similar test:
" '. . . allegations must disclose a performance by counsel so incompetent as to make the trial "a farce or a mockery of justice." ' *Rivera v. United States* (9th Cir. 1963), 318 Fed. (2d) 606, 608." [6]

It is readily apparent that, by the use of such terms as "no representation," and "farce or a mockery of justice," to describe a criminal trial in which private counsel's conduct is inadequate, the courts have not fashioned a test which is capable of precise application, since the terms are highly subjective. Also use of such terms, especially the "no representation" test of *Pulaski*, suggests the great reluctance of this court to grant relief where the claim is made that the defendant's conviction was occasioned by inadequate representation at trial.

We will now consider seriatim the four alleged failures of trial counsel to properly protect the rights of defendant. The first of these is the failure to move for the production of the report of the doctor who examined complainant at the request of the police, and the report of

[3] *Pulaski v. State* (1964), 23 Wis. (2d) 138, 148, 126 N. W. (2d) 625; *State v. Henderson* (1937), 226 Wis. 154, 167, 274 N. W. 266.

[4] (1965), 29 Wis. (2d) 212, 138 N. W. (2d) 173.

[5] *Supra*, footnote 3.

[6] *Supra*, footnote 4, at page 223. In *Pulaski, supra,* footnote 3, at page 148, the court pointed out the evil that would present itself if such were not the state of the law:

"If something less than the highest degree of skill and competency of counsel were a ground for a new trial, nothing would prevent the accused in the first instance from hiring competent counsel but admittedly not the most skilful in order to assure himself a second opportunity for acquittal. Such a rule would lead to great abuse and could not be justified in the interest of justice."

the state crime laboratory. Trial counsel first learned of the existence of these reports during the course of the trial as the state had not previously advised counsel of the results of these examinations. It is now claimed that findings of the doctor and the state crime laboratory would have constituted the only unbiased testimony for the determination of credibility of complainant and defendant.

In considering this contention it must be borne in mind that defendant admitted the act of intercourse. Thus the only possible basis for assuming that the reports of the doctor and the state crime laboratory would be favorable to defendant would be that they would show no exertion of violence on defendant's part. However, such additional evidence would have been merely cumulative in character because there was evidence that the complainant was not bruised in any manner, that the vaginal pad and panties sent to the state crime laboratory were not soiled, and that her underclothes were very nice after the act as testified to by complainant herself.

The second assignment of failure of trial counsel was his failure to move for the production of the statement which complainant gave to the police on the morning of the alleged rape. The evidence does not disclose whether such statement was written or consisted of a transcript of what she had orally told the police. Under *State v. Richards* [7] counsel was entitled to have such statement produced and an *in camera* inspection made by the trial court to ascertain whether it contained inconsistencies which would render it usable for impeachment purposes. The failure of trial counsel to move for the production of the statement denied defendant the valuable opportunity of possibly impeaching the credibility of the state's only witness as to the commission of the alleged crime itself.

---

[7] (1963), 21 Wis. (2d) 622, 633, 124 N. W. (2d) 684.

At the hearing of the motion for new trial, trial counsel was asked whether he was familiar with the holding of the *Richards Case* as well as *Brady v. Maryland.*[8] The question was objected to and the objection sustained on the ground of immateriality. Defendant then made an offer of proof to the effect that, if the witness were allowed to testify, he would state that he was not familiar with the holding in either case.

The third ground of attack upon the effectiveness of trial counsel consisted of his failure to object to certain questions propounded to Robert Petry, witness for the defense, and to defendant himself. In the assistant district attorney's cross-examination of Petry the following questions were asked and answers given without objection by defendant's counsel:

"*Q.* Have you ever been arrested and convicted of a crime? *A.* Yeh, I was arrested a lot of times.

"*Q.* How many? *A.* I don't know. About seven times in one year, 1963 or 1964."

Likewise in cross-examination of defendant, the assistant district attorney asked him if he had not been arrested and convicted of a battery on June 21, 1961, and fined $100; if he had not been arrested and convicted of another crime on November 13, 1961, and given thirty days under the Huber Act; and if he had not been arrested and convicted of a battery on March 24, 1965, and given two years' probation. Not only did trial counsel not object to these questions but stated that he was stipulating to defendant's record.

The law in Wisconsin is well established that in a criminal case a witness cannot be impeached by showing an arrest where there is no conviction.[9] It was also error for the prosecution to inquire into the nature

[8] (1963), 373 U. S. 83, 83 Sup. Ct. 1194, 10 L. Ed. (2d) 215.

[9] *State v. Raether* (1951), 259 Wis. 391, 48 N. W. (2d) 483; *McKesson v. Sherman* (1881), 51 Wis. 303, 8 N. W. 200.

of prior convictions and sentences imposed thereon, absent any denial of such convictions.[10]

The state concedes that the questions were improper. However, we must assume that the error was not prejudicial under the well-established rule in this state that on trial to the court the judge is presumed to know what testimony is competent and will disregard extraneous matter.[11]

The last alleged ground of ineffectiveness of trial counsel was his failure to question Verdell Nelson with respect to the paint-brush incident testified to by complainant. Complainant testified that the money she had with her at the time of the alleged rape was the change she had received from Verdell Nelson from a $10 bill as the result of paying him for a $1.25 paint brush on the evening of January 2, 1965. It was complainant's story that she had asked Nelson to order the paint brush for her and he had brought it over to her house. She then told him she did not have the money to pay for it but "would pay him when she came out," apparently referring to the evening on which the poker party took place.

Nelson, who was called as a witness for the state, testified that he had seen complainant quite often until May of 1963, when she went to Washington, and that the next time he saw her was in January of 1965. He was then asked these questions by the assistant district attorney and gave these answers:

"*Q.* Is that about the time you are talking about—January 3? *A.* That's right; that is the time.

"*Q.* Was that the first time you saw her after she went to Washington? *A.* That is the first time I saw her."

[10] *State v. Raether, supra,* footnote 9; *State v. Adams* (1950), 257 Wis. 433, 43 N. W. (2d) 446.

[11] See *Gauthier v. State* (1965), 28 Wis. (2d) 412, 421, 137 N. W. (2d) 101; *Birmingham v. State* (1938), 228 Wis. 448, 453, 279 N. W. 15.

Apparently the assistant district attorney erroneously used the date of January 3d instead of January 2d. Nelson's answers, however, are subject to the interpretation that the first time he had seen complainant since 1963 was on the occasion when she came to his home on the evening of January 2, 1965. So interpreted, this would conflict with complainant's testimony that earlier that day he had brought the paint brush to her apartment.

It will be recalled that defendant testified that he had paid complainant $6 or $7 after consummating the act of intercourse. This amount of money is very close to the amount of money complainant testified she had with her at the time of the alleged rape. Thus, the source of the money she had with her was crucial on the issue of the credibility of both complainant and defendant. Because of this, defendant contends his trial counsel should have questioned Nelson about the paint-brush transaction testified to by complainant. Nelson, however, was the state's witness and it is apparent from his testimony that he was friendly to complainant. For example, he corroborated complainant's testimony that the poker game was not played for money, while defendant and Petry had testified that the stakes were money. Considerable risk would be involved on the part of trial counsel in asking this hostile witness about the paint-brush incident, not knowing what his answer might be. If the question were put and Nelson would have corroborated plaintiff, irreparable harm would have been done to defendant's cause. As a matter of tactics it is inadvisable to ask a question directly pertaining to a crucial or critical fact on which the outcome of the case might well depend unless the examiner is reasonably confident the answer will be favorable.[12]

_____

[12] See in general, McCormick, Evidence (hornbook series, 1954), p. 56, sec. 30 (The Cross-Examiner's Art). In Ramage, A Few Rules for the Cross-Examination of Witnesses, 91 Central Law

We, therefore, find no basis for the charge that trial counsel was ineffective because of failing to question Nelson about the paint-brush transaction.

Our review of the record discloses that trial counsel conducted a vigorous cross-examination of complainant which tends to rebut the charge that his representation was so ineffective as to amount to no representation at all. The point of attack we deem has greatest merit was trial counsel's failure to familiarize himself with the *Richards Case*,[13] and to ask in the absence of the jury for production of complainant's statement to the police. However, it would be highly speculative to indulge in the assumption that such statement would have yielded an effective basis for impeachment of plaintiff's credibility. In order for a failure of trial counsel to afford grounds for a new trial there must be a showing of prejudice.[14]

In *Blitstein v. State*[15] it was claimed that the accused was not fairly represented or his rights safeguarded because of the accumulative effect of mistakes and failures on the part of counsel. In affirming the denial of a motion for a new trial this court stated:

"Inexperience in a relation of this character is of itself no ground for a new trial. *People v. Schulman,* 299 Ill. 125, 132 N. W. 530. There must be a resulting deprivation of a substantial right. *State v. Barr,* 123 Iowa 139, 98 N. W. 595. If the record discloses that the defendant has suffered in this respect a new trial should follow. The consideration in this matter is thus limited to a determination as to the existence of acts or failures on the part of the defense during the trial which deprived the accused of rights belonging to him." [16]

Journal, 354, the author states: "Experienced practitioners ask no questions on cross-examination unless they apprehend some benefit and no damage from adopting the opposite course."

[13] *Supra,* footnote 7.

[14] 24 C. J. S., Criminal Law, p. 68, sec. 1443.

[15] (1935), 218 Wis. 356, 259 N. W. 715.

[16] Id. at page 359. See also *State v. Henderson* (1937), 226 Wis. 154, 167, 274 N. W. 266; *Wilson v. State* (1956), 273 Wis. 522, 78 N. W. (2d) 917.

We conclude that defendant is not entitled to a new trial on the ground of ineffectiveness of his trial counsel.

### Failure of State to Disclose Evidence.

Defendant further contends that he was denied due process of law by the failure of the state to disclose to the defendant the report of the doctor who examined complainant and the report of the state crime laboratory made after examination of complainant's vaginal pad and panties. In support of this contention defendant quotes the following extract of the United States supreme court's decision in *Brady v. Maryland:* [17]

"We now hold that the suppression by the prosecution of evidence *favorable to an accused* upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Emphasis supplied.) [18]

Defendant also cites the later federal case of *United States v. Wilkins,* [19] wherein it was held that even without a request from defense counsel there is a duty on the part of the prosecution to disclose evidence favorable to an accused.

In *Brady v. Maryland,* [20] the petitioner had been convicted in a Maryland state court on a charge of murder in the first degree and had been sentenced to death. He learned of an extrajudicial confession of his accomplice, tried separately, admitting the actual homicide. This confession had been suppressed by the prosecution notwithstanding a request by the petitioner's counsel to allow him to examine the statements. Upon appeal from the trial court's dismissal of his petition for post-con-

[17] *Supra,* footnote 8.
[18] Id. at page 87.
[19] (2d Cir. 1964), 326 Fed. (2d) 135, 137.
[20] *Supra,* footnote 8.

viction relief, the Maryland court of appeals held that the suppression of the evidence by the prosecution denied petitioner due process of law. On certiorari, the United States court affirmed.

As previously pointed out herein, the doctor's report and the report of the state crime laboratory could only have been cumulative in character with respect to the undisputed evidence already in the record negating any use of force by defendant sufficient to tear complainant's clothing or inflict bruises upon her. Furthermore, defendant's trial counsel knew at the time of trial of the doctor's examination and the sending of items of complainant's clothing to the crime laboratory, and made no request for production of such reports. We consider the facts herein clearly distinguishable from *Brady v. Maryland*. Neither do we think that the holding in *United States v. Wilkins* should be extended to cumulative evidence the essence of which is made known to the counsel of the accused and yet no request is made for the production of such evidence. We have previously found that no prejudice to defendant occurred as a result of the state's failure to produce these reports. For these reasons we do not find that any denial of due process occurred.

*By the Court.*—Judgment and order affirmed.